UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

*In re*:

Case Number: 21-12161-7

DENNIS WESTLEY ELIASON
and AMY MARIE ELIASON,

Debtors.

DENNIS WESTLEY ELIASON
and AMY MARIE ELIASON,

Plaintiffs and
Counter-Defendants,

v.

Adversary Number:  23-00002

BANK OF NORTH DAKOTA,

Defendant and
Counter-Claimant.

## MEMORANDUM DECISION

Plaintiffs Amy Eliason and Dennis Eliason seek to discharge Amy's student loan obligations to Defendant Bank of North Dakota ("BND") under 11 U.S.C. § 523(a)(8), arguing that the loans pose an undue hardship. Amy owes approximately $59,270 to BND from loans that she took out in 2010 and 2011 to attend Globe University in Eau Claire, Wisconsin. BND asks that discharge of the loans be denied and that a judgment for the principal, interest, costs, and fees due under the loan be granted against Amy Eliason. For reasons stated below, this Court grants a discharge.

## FACTS

A. <u>Background</u>

In 2010 and 2011, Amy obtained two loans from BND to attend Globe University. She was pursuing a degree to become a certified medical assistant. Her mother cosigned the loans from BND. Amy also took out a loan from the U.S. Department of Education.

Amy used the loans to pay for tuition, school costs, and living expenses. At the time of admission, Amy was told that she could obtain certification as a medical assistant. But in the fall of 2011, a few months before graduation, she was told by the program director that the Globe campus in Eau Claire did not provide such certification. Amy graduated with an associate degree of applied medical science in December 2011 but without any certification.

Globe permanently closed in 2017.

To become certified, she would have needed to travel to Minnesota and pay an additional certification fee. Instead, she attempted to transfer her credits to a school in the Eau Claire area—Chippewa Valley Technical College ("CVTC")—but discovered that her credits from Globe University would not transfer. The inability to transfer credits was contrary to assurances she received when she enrolled at Globe.

Amy was also pregnant around the time of her graduation and was experiencing difficulties related to her pregnancy, including preeclampsia. She was temporarily bedridden as a result. Amy gave birth to the couples' son in June 2012, six weeks premature.

She did not obtain the certification. Multiple factors interfered with her becoming certified including the fee, the required travel to Minnesota, the difficulties of her pregnancy, and the impossibility of transferring her credits to CVTC. Sometime in 2012 she spoke to Globe's program director about taking the exam. The director said she had been out of class too long and would need to monitor or take classes again before taking the test. This would have required more time and money.

Since graduating from Globe in 2011, Amy has held a string of jobs for minimal pay. Amy has been out of work for large periods of time since she graduated, beginning with her pregnancy difficulties in 2012.

After focusing on child-rearing for 2012 and 2013, she tried to find a job related to her degree. She began working part-time as a registration clerk at a local hospital through a temp agency making $12 per hour. Amy left that job in 2014, however, because her father died. She then took a full-time position at another hospital in 2015, but left in June 2016 when her mother passed away.

In October 2016, Amy started work full-time as an insurance claims processor. She was making $15 per hour. She left that job in December 2018 to work on a factory line for $18 per hour but was laid off by the factory a year later.

Since then Amy has worked part-time both as a taxi driver and as a bartender/server. She currently works part-time as a clerk at a convenience store. In her current job she can walk to work thus allowing the family to cut back to one car.

Dennis has an associate degree in business management from CVTC earned in 2008. He worked at a local grocery store from 2001 until 2012. His maximum wage was $12.90 per hour.

He left the grocery store to work for a manufacturer but got injured on the job in April 2012 suffering a herniated disc. He was out of work until June 2013 when he took a quality control position with another manufacturer making $18 per hour. He left that job in April 2014 because he needed neck surgery. His recovery lasted six months to a year.

He started working again in June 2016 at the local grocery store, making $13 per hour. A second surgery for a spinal fusion in 2017 resulted in his leaving that job. Dennis received four to five months of short term disability.

In February 2018 he took another manufacturing job that might lead to $16 per hour. He left that job after three months. Yet another surgery was required in June 2018 for placement of rods in his cervical spine.

Late in 2018 Dennis tried returning to the manufacturing job. After a couple months his doctor said he could no longer do that job, and by November of that year he was out of work.

 Dennis applied for SSDI. After an initial denial, he hired an attorney to pursue those benefits. Finally he began receiving SSDI benefits in January 2019. It was determined that he had the residual capacity to perform light work but would be limited to standing and/or walking no more than four hours in any eight-hour shift. Other limitations noted by the Social Security Administration included the need for him to "be off task up to 1/3 of the

workday and . . . [for] unscheduled breaks, in addition to regular work breaks."[1] His disability began January 1, 2019, and was subject to a continuing disability review in 18 months. The review period has lapsed and he continues to receive SSDI.

 Dennis now works part-time as a clerk at a gas station. He recently received a raise to $15.45 per hour. His job falls within the limitations found by the Social Security Administration for his SSDI.

In 2019, Plaintiffs were evicted from their apartment. They were forced to move in with Dennis's father in Chippewa Falls. After that, they moved into a trailer park. But they had to leave the trailer park earlier this summer because of a problem with water contamination. They now rent a house in Cadott, Wisconsin.

B. Loan Status and Finances

Amy received at least 36 months of deferment and 18 months of forbearance after her payments to BND first came due in 2012. In 2018, BND sent Amy a notice of acceleration stating that the $36,775.78 balance of her loans was due in full. The balance on Amy's BND loans is approximately $59,270.

Plaintiffs' student loan obligations to the Department of Education were subject to income-based repayments, with periodic payments of $0 per month based on their income.

---

[1] ECF No. 14-10, p. 7.

Amy's loans with the Department of Education were subject to a hardship discharge after a stipulation and order by this Court in 2022.[2] And in 2022, Dennis received a probationary administrative discharge of his student loans through the Department of Education's Total and Permanent Disability discharge program.

The Plaintiffs' tax returns show $52,194 in wages in 2018, $11,369 in 2019 (plus $10,182 in SSDI benefits), $1,194 in 2020 (plus $20,676 in SSDI), $8,593 in 2021 (plus $20,953 in SSDI), and $23,700 in 2022 (plus $22,200 in SSDI).

Amy and Dennis list $10,609.32 in estimated assets and $232,379.65 in estimated liabilities. According to their Schedule I, their combined monthly income was $2,610.51 at the time of filing, which included $1,594 in social security benefits for the Debtors, $345 in social security benefits for their minor son, and $35 in SNAP benefits.

The Plaintiffs' Schedule J listed a $435 monthly rent/mortgage payment along with modest payments for food ($500), clothing ($100), personal care products ($100), and transportation ($100). The rent was the amount for the trailer. When forced to leave the trailer because of water contamination, they struggled to find housing. Because of the past eviction and the bankruptcy, the search was very hard. Some landlords simply refused to consider renting to them. They "took what they could find." That is a house. The rent, however, is

---

[2] Adv. Proc. No. 21-38, ECF No. 19.

$1,500 per month. The Debtors also bought a 2013 Hyundai Tucson post-petition that requires monthly payments of $409.18. This is their only vehicle.

**DISCUSSION**

A. <u>Jurisdiction</u>

This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157(a). Venue is proper in this Court as provided in 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (J). The Court may enter final judgment. 28 U.S.C. § 157(b)(1).

B. <u>Student Loan Discharge Under 11 U.S.C. § 523(a)(8)</u>

The Bankruptcy Code provides that a student loan guaranteed by a governmental unit may be discharged in bankruptcy if not doing so would impose an undue hardship on the debtor. 11 U.S.C. § 523(a)(8). "Undue hardship" requires a three-part showing (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good-faith efforts to repay the loans. *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987); *In re Roberson*, 999 F.2d 1132 (7th Cir. 1993). The debtor bears the burden of proving undue hardship by a preponderance of the evidence. *Grogan v. Gardner*, 498 U.S. 279 (1991).

*1. Minimal Standard of Living*

The Court must first address whether Plaintiffs maintain a "minimal" standard of living. This prong "should serve as the starting point . . . since information regarding the debtor's current financial situation generally will be concrete and readily obtainable." *Roberson*, 999 F.2d at 1135. Basically, the question is whether the Plaintiffs' present income and expenses permit repayment. *See Nelsen v. Educ. Credit Mgmt. Corp. (In re Nelsen)*, 404 B.R. 892, 894 (Bankr. E.D. Wis. 2009).

A debtor is not expected to live in "abject poverty" to repay a student loan, but a minimal standard of living requires "more than a showing of tight finances." *Salinas v. United Student Aid Funds, Inc. (In re Salinas)*, 258 B.R. 913, 918 (Bankr. W.D. Wis. 2001) (citing *Stein v. Bank of New England, N.A. (In re Stein)*, 218 B.R. 281, 287 (Bankr. D. Conn. 1998)). "If the debtor has done everything he can to minimize expenses and maximize income, there is no basis for refusing to discharge the student loans." *Salinas*, 258 B.R. at 918 (citation omitted). The court must examine the debtor's current income and expenses and determine a "'flexible minimal standard of living' which is sensitive to the particular circumstances of each case through the application of common sense." *Id.* (citing *Stein*, 218 B.R. at 287).

Plaintiffs make low-wage salaries. Unfortunate circumstances impacted their employment: misrepresentations by Globe, health issues, a premature birth, family deaths, and a layoff. Even so, Amy has found alternate work. Dennis continues to work part-time despite his disability. The initial Social

Security review period has expired and he continues to receive SSDI. Despite part-time work, his SSDI has not been reduced.

While the amount of SSDI could be changed in the future, there was no evidence presented to controvert the Social Security determinations[3] that he (1) is unable to perform past relevant work; (2) has severe impairments to his spine; (3) is limited to light work with standing or walking of four hours in an eight-hour work day; (4) is limited to low stress jobs; and (5) is limited to unskilled jobs.

Additionally, the Plaintiffs' tax returns show a substantial drop in income over the past few years:

> ➢ $52,194 in 2018

> ➢ $11,369 (plus SSDI) in 2019

> ➢ $1,194 (plus SSDI) in 2020

> ➢ $8,593 (plus SSDI) in 2021

> ➢ $25,100 (plus SSDI) in 2022

The returns also demonstrate, as did Plaintiffs' credible testimony, that both have continued to seek employment. Slowly those efforts have resulted in increases in gross income. Dennis's testimony was also highly credible that he has significant limitations that will continue indefinitely.

---

[3] ECF No. 14-10.

While the federal poverty line is an imperfect measure of individual financial health, the 2022 level was $23,030 for a family of 3, which the Plaintiffs barely surpassed.

The historical evidence of the Eliasons' finances presented at trial paints the picture of a family struggling to maintain a minimal standard of living for years. The income of both Plaintiffs has remained low since the limitations on Dennis's employment. Plaintiffs have been earning unskilled wages since Amy's graduation from Globe, and they continue to earn modest wages today.

Dennis's student loans with the Department of Education, which are in the three-year probationary period, may be subject to payment if his disability does not continue for at least three years from the SSDI determination.

Defendant points to testimony that the couples' current monthly income is $4,600. This includes $2,412[4] per month in SSDI. This must, according to BND, leave money to make payments on the student loans. BND reaches that conclusion based on its "back-of-the-envelope" calculation using appropriate IRS guidelines for expenses.

This "calculation" assumes that the rent paid by Plaintiffs is higher than the standard expenses for a household of three in Chippewa County—$1,223.[5]

---

[4] The SSDI currently consists of $1,608 in benefits for Dennis and $804 for the benefit of the minor child. This latter amount is paid $402 each to Amy and the minor child at present.

[5] This figure applies to cases filed on May 15, 2023, and beyond. The Debtors filed their bankruptcy in October 2021, at which time the standard housing expenses in Chippewa County was $1,017.
https://www.justice.gov/ust/eo/bapcpa/20210515/bci_data/housing_charts/irs_housing_charts_WI.htm, last accessed July 31, 2023).

Simply using the national standards for expenses related to out-of-pocket healthcare, food, clothing and other items, and transportation, BND says the expenses should be $3,227, leaving over $1,300 per month in disposable income. So Defendant believes that Plaintiffs can make significant monthly payments on the loans.

This view ignores the facts. The rent and utilities of Plaintiffs are $472.25 higher than the averages. This is because many landlords would not rent to Plaintiffs and they had to "take what we could get." It also ignores the fact they have a 2013 car and the amount spent is above the average just in car payments because it is the only way to keep their only car. There are related costs such as insurance and fuel that further increase the transportation expense. It also assumes the erroneous idea that the $804 per month in SSDI benefits for the minor child will remain available to them to spend as they may need.

Plaintiffs have a single vehicle. They have no significant assets. Their car payment is $409 per month. They have had to borrow money since their bankruptcy to keep up with their bills.

In any event, it's clear that Plaintiffs currently maintain a minimal standard of living sufficient to satisfy *Brunner*. Plaintiffs testified that they've been able to save "pretty much nothing" over the years since Amy has graduated.[6] After paying monthly expenses, it's "not common" to have money

---

[6] Amy's Testimony at 10:54:45.

left over.[7] Dennis believably testified to currently spending only about $200 per month on groceries, and Amy testified that they often get help from food pantries. Amy also stated that they've taken out loans to help with rent, bills, and food. They've been "trying to stay afloat."[8]

Evidence presented at trial along with Plaintiffs' schedules and tax returns reflect more than a showing of tight finances. According to testimony presented at trial and Plaintiffs' Schedule I, about half of their income derives from government benefits, including SSDI and SNAP payments. And despite Defendant's arguments, all of Plaintiffs' expenses are near or below IRS National Standards. Additionally, there are (and will likely be) other unaccounted-for expenses that further reduce their disposable income:

| Expense | Amount | National Standard |
|---|---|---|
| Rent | $1,500 | $1,223 (Chippewa County) |
| Utilities | $623 ($465 phone; $158 electricity, heat, gas) | $724 |
| Food, Clothing, Housekeeping Supplies, and Personal Care Products | $600 | $1,700 |
| Transportation | $409 | $225 |
| Medical & Dental Expenses | $100 | $237 (3 people under 65) |

Plaintiffs lead a frugal life.

---

[7] *Id.* at 10:56:50.

[8] *Id.* at 11:05:46.

Defendant concedes that if the loans are not discharged the entire outstanding amount would be immediately due. But Defendant claims that guardrails are in place—like exemptions and limitations on garnishment—that would leave Plaintiffs with sufficient monthly income. Those "guardrails" would still leave huge debt looming over Plaintiffs.

Defendant also admits that it's unlikely the full balance will ever be recovered from Plaintiffs. Nonetheless BND demands a judgment for the full amount due. It merely volunteers that, if granted a judgment, it might be willing to forbear collection and accept a repayment plan of only the principal amount of $59,270.03. It suggests such a plan could be installments of $197.56 per month over 25 years. BND cannot be compelled to accept such a plan and the moment there is any sort of default (as that might be defined by BND in a forbearance) it would be entitled to immediately pursue collection of the entire balance. Absent an agreement it would be entitled to immediate payment in full.

2.   *Additional Circumstances Likely to Persist for Significant Portion of Repayment Period*

The second prong of the *Brunner* test requires a showing that additional circumstances are present that make the debtor's dire financial condition likely to exist for much of the repayment period. "It is the feasibility of repayment, not the absolute certainty of financial destitution, that is the key determination." *Salinas*, 258 B.R. at 921 (citing *Roberson*, 999 F.2d at 1135) (court must focus on whether lack of financial ability is "likely" to continue into the foreseeable future).

The court in *Salinas* found that a debtor had met the "additional circumstances" test under the following set of facts:

> He has a minor son. He is 43 years old. He has no particular prospects of increasing his earning power significantly beyond the $30,000.00 per year he mentioned in his testimony. He has not been able to make payments on the $68,694.49 in HEAL loans he does not ask to have discharged. Even if the debtor could squeeze enough from his living expenses to pay a few dollars on the loans at issue in this case, committing him to that enterprise over the next 20 years would amount to an insupportable sentence of impoverishment and hopelessness unless, of course, his circumstances improve substantially and unforeseeably. The Court foresees no such improvement.

258 B.R. at 922 (citation omitted).

Here, Plaintiffs say that Dennis's prospects for greater income in the future are severely limited due to his continuing disability, and that Amy's prospects for greater income in the future are also severely limited due to her lack of certification as a medical assistant. Both Dennis's disability status and Amy's lack of certification resulted from factors beyond either of their control. Both have only qualifications for unskilled work. There is no evidence they are likely to find higher paying jobs in the foreseeable future.

BND responds that Amy does not have the same conditions as Dennis. But she was misled about what would be required for the certification. She was in a high risk pregnancy, unable to travel or pay the cost of the certification just after graduation. She believably testified that after some time she returned and spoke with Globe's program director to find out if she could get the certification. She was told too much time had elapsed and she would have to

take more classes to pass the exam. Whether this statement by Globe was true or not, it was the information presented to her.

Now, after 10 years have passed, BND says she should have made efforts to become certified. What she may have done years ago does not define her present situation. Her credits would not transfer to any other school. Globe had closed and lost any accreditation it might have had. No facts are offered to explain what other efforts she should have made. Neither were any facts presented that even suggest that after the lapse of time she should simply take an exam to be certified. She is not certified.

BDN says that both Dennis and Amy are intelligent, not near retirement age, and have plenty of time to raise their earning capacity. BND argues Amy can return to work full-time. It speculates her income will likely increase over time.

She has recently taken new employment. Her hours may increase. She may find a job that pays a higher hourly wage. This is, however, mere speculation. It is clear from her employment history that she has tried to have continuous employment. While her current job may not have the same hourly rate, she can walk to work thus saving transportation costs.

Defendant also tries to align the facts here with the facts presented in *Manion v. Modeen (In re Modeen)*, 586 B.R. 298 (Bankr. W.D. Wis. 2018). In that case, the Debtor was in her mid-30s and worked full-time as an office manager to support her 18-year-old daughter. She also worked a few hours a week at a second job. This Court found that debtor did not satisfy the second

15

prong of *Brunner*. In part, the Court was critical of the debtor choosing to fully provide for her adult live-in daughter, who contributed nothing to household expenses. Beyond that, the debtor "ha[d] skills and certifications that she uses in her employment," and that there were "certainly opportunities for people with her skill set." 586 B.R. at 304. This Court found that:

> She can work full time and has articulated no circumstance that seriously limits her employability. She is young, has many working years ahead of her, and her income will likely increase over time. While inflation may increase some expenses, others should be reduced either by her daughter contributing to household expenses or, at some point, living independently. In sum, there is no additional circumstance here that would justify a finding that [Debtor's] situation will not improve or that she will have no ability to make payment over time.

*Id.*

The facts here are distinguishable from *Modeen*. There is no evidence the Plaintiffs can boost their earning potential to any significant degree during a repayment period. BND concedes it is unlikely the debt will ever be repaid in full.

Amy is limited in her future earning potential. Her highest level of education is the associate degree in applied medical science she received from Globe. Amy has been unemployed, but even during her recent employment periods she was not earning more than $13.00 per hour. Her recent jobs have included: taxi driver, bartender/server, a "process specialist," and insurance claims processor. All her past jobs were entry-level positions, and she hasn't held any position for more than two years.

Additionally, Defendant in part argues that "Amy not getting her certification is not by some exceptional circumstance beyond her control." This argument seems to imply that Amy can still get her medical assistant certification to increase her future earning potential. It also hints that Globe's misrepresentations or fraud were not exceptional or that she should have anticipated a way to address the omissions about certification and transferability of her credits.

But it's unclear what effect Globe's University's closure in 2017 has on the accreditation status of its medical assistant program and, therefore, Amy's ability to sit for a certification test.[9]  Further, too much time might have elapsed and retaking courses she cannot afford might actually be required. Neither was any evidence presented about how a certification might impact hourly pay or available job opportunities.

Although the couples' income was high in 2018, that was due to both Dennis and Amy working full-time. But Dennis was deemed "disabled" by an administrative law judge as of January 1, 2019. He began receiving SSDI payments. In part, the judge found that Dennis suffers from "spine disorders and osteoarthritis, including degenerative arthritis of the cervical spine,

---

[9] Globe University closed after facing allegations of fraud and misrepresentation. *State v. Minnesota Sch. of Bus., Inc.*, 899 N.W.2d 467 (Minn. 2017); *State v. Minnesota Sch. of Bus., Inc.*, 935 N.W.2d 124, 138 (Minn. 2019) ("In light of all the evidence and the findings by the district court, we conclude that the Attorney General established a causal nexus between the Schools' misleading statements and the harm suffered by the nontestifying students. The Schools should not profit from fraudulently providing a useless degree to their students.").

degenerative disc disease of the lumbar spine and thoracic spine and peripheral neuropathy in his upper and lower extremities."[10] The judge determined that Dennis "is limited to standing and/or walking a total of four hours in an 8-hour workday. He can occasionally push/pull with the left upper extremity and occasionally reach overhead bilaterally. [He] can never climb ladders, ropes or scaffolds."[11] Dennis is further limited to "low stress jobs, defined as no fast paced production line work, assembly line work or tandem tasks."[12]

Defendant highlights a note in the administrative law judge's findings that "[m]edical improvement is expected with appropriate treatment [and recommends review of whether the disability continues] in 18 months" from the date of the decision. But the decision was issued in June 2019—more than 18 months ago. Dennis continues to receive SSDI payments. No evidence was presented at trial to persuade this Court that his condition will improve during the loan repayment period.

And the debtor in *Modeen* was supporting an adult child who did not contribute to household expenses. Here, the Plaintiffs are supporting their 12-year-old-son using $804 per month in SSDI benefits for him.

In this case, the "repayment period" is *immediately*. If not discharged, the entire $59,270 is immediately due and payable.

---

[10] ECF No. 14-10.

[11] *Id.*

[12] *Id.*

The Court finds that the Plaintiffs cannot significantly increase their earning potential during the repayment period based on factors beyond their control. Similar to *Salinas*, even if the Plaintiffs could squeeze enough from their already tight living expenses to pay a few dollars on the loans at issue, "committing [them] to that enterprise over the next 20 years would amount to an insupportable sentence of impoverishment and hopelessness unless, of course, [their] circumstances improve substantially and unforeseeably. The Court foresees no such improvement." 258 B.R. at 922.

Here, no extended period is actually enforceable. While BND might offer some period, it could also deny any extension or call a default. The 25 years mentioned as possible would sentence the Plaintiffs to unsupportable hopelessness and impoverishment.

### 3. *Good Faith Effort to Repay*

The final prong of *Brunner* analyzes whether a debtor has made a good faith effort to repay their student loans. The touchstone of this analysis is whether a debtor tried to "obtain employment, maximize income, and minimize expenses." *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 779 (7th Cir. 2002); *Roberson*, 999 F.2d at 1136. The inquiry also scrutinizes whether the debtor "willfully or negligently" caused a default, or whether the debtor's condition resulted from "factors beyond [her] reasonable control." *Roberson*, 999 F.2d at 1136.

Plaintiffs emphasize that minimal or even complete lack of payments cannot be attributable to lack of "good faith" under the third prong of the

*Brunner* test if such payments were impossible to make, and if the reason for the inability to make payments was due to factors beyond the debtor's control. Plaintiffs state that Defendant does not offer any of the loan forgiveness or payment modification programs made available to student loan debtors by the Department of Education, other than forbearance case-by-case.

Defendant, on the other hand, believes that Amy did not make a good faith effort to repay the loans. Defendant does not have a record of Amy making any payments on the loans at all. It also argues that Amy did not make a good faith effort to obtain her certification and that, from approximately the beginning of 2020 to today, Amy has not made a good faith effort to obtain gainful employment that would allow her to make payments.

Defendant analyzes the third prong of *Brunner* with particular focus on the language that a defendant "has made a good faith effort to *repay* her student loans." Defendant insists that *Brunner* requires that a debtor make efforts to repay the loan, and that this Court "should not credit Amy for applying for a forbearance or deferment as anything nearing a commonsense reading of what it means to make a repayment."

The Defendant's analysis of the "good faith" prong of the *Brunner* test is wrong. In line with precedent, this Court has held that a debtor need not have paid a certain percentage or minimum amount of the loan to show good faith. *Vang v. UW Stout Student Bus. Servs. (In re Vang)*, 324 B.R. 76, 85 (Bankr. W.D. Wis. 2005) ("If the debtor has not had the financial ability to pay the debt, he will not be penalized as a result."). The issue, ultimately, is whether the

defaults result not from voluntary choices but from factors beyond the debtor's reasonable control. *See also Salinas*, 258 B.R. at 922 ("[A] failure to pay will not result in a finding of lack of good faith where the debtor has no funds to make any repayment.").

Other courts have ruled similarly. In determining whether a student loan should be discharged under the *Brunner* test, the court in *Bell v. U.S. Dep't of Educ. (In re Bell)*, 633 B.R. 164 (Bankr. W.D. Va. 2021), reasoned that:

> This Court has been provided with no case law holding that the debtor make a certain number of payments on his loans to demonstrate a good faith effort to repay the loans. This is particularly so when the debtor's circumstances qualify him for forbearance of his loans and a zero-dollar payment plan. In other words, "[t]he failure to have made any repayments on a student loan is not a litmus test for good faith under the third prong of the *Brunner* test. The good faith determination depends on the reasons why the Debtor did not make the payments." *Roundtree-Crawley v. Educ. Credit Mgmt. Corp. (In re Crawley)*, 460 B.R. 421, 446 n.36 (Bankr. E.D. Penn. 2011).

633 B.R. 164, 183. The court in *Bell* ultimately discharged the debtor's student loans. As to the good faith prong, the court found that the Debtor's financial situation simply rendered him unable to make the payments.

Here, it was revealed at trial that Amy requested and received at least 36 months of deferment and 18 months of forbearance from Defendant during the repayment period. That Amy requested and received these suspensions in payments indicates she was diligent in reaching out to Defendant for some time and that she and Dennis were facing substantial financial difficulties.

Indeed, Amy and Dennis also addressed and benefited from income-based repayment plans for their federal student loans. Under these repayment

plans their monthly payments were reduced to zero or a nominal monthly amount as a result. This aligns with the situation in *Bell*, where the debtor's circumstances qualified him for forbearance of his loans and a zero-dollar payment plan, and the court found that the good faith prong had been satisfied.

As the record confirms, the Plaintiffs qualified for forbearance and zero-dollar payment of their federal loans and the deferments and forbearance from BND. The record is devoid of what other repayment efforts would thus be needed to satisfy good faith.

The evidence shows that the Plaintiffs have financially struggled for significant periods of time since Amy took out the loans. Shortly after Amy graduated from Globe University, she and Dennis had a baby. That same year, Dennis suffered a herniated disc and was out of work. Dennis then needed neck surgery in 2014. Dennis subsequently had back problems, anxiety, and depression. Sometime in 2015, Amy's mom's health declined which required Amy to take care of her before she eventually passed away in 2016. Then in 2018, Dennis received a second neck surgery and was officially found partially disabled by an administrative law judge in January 2019. And since 2019, the Plaintiffs' tax returns illustrate their financial struggles with their income plunging from $52,194 in 2018 to $13,757 in 2019; $1,194 in 2020; $8,593 in 2021; and $25,100 in 2022.

Defendant emphasizes that the Plaintiffs continued to eat out at restaurants, and that this shows that they're not attempting to minimize

expenses. But Plaintiffs credibly explained that at times eating out was actually as cheap as buying and preparing food. And this doesn't dispel the fact that their overall financial picture is grim. It's unclear what amount, if any, the Plaintiffs should have paid to Defendant that would evidence the good faith attempt to repay the debt BND says is missing.

Lastly, it's notable that the loans here first became due more than ten years ago. On this point, the Bankruptcy Court for the Central District of Illinois reasoned that:

> [O]ne of the fundamental policies underlying the *Brunner* test [is] that, all else being equal, the older the loans are, the more readily they will be discharged. This temporal element is overtly apparent in *Brunner's* second prong, which limits the predicted future inability to pay to a "significant portion of the repayment period of the student loan." It is also implicit in *Brunner's* third prong.

*Lewis v. Illinois Student Assistance Comm'n (In re Lewis)*, 276 B.R. 912, 919-20 (Bankr. C.D. Ill. 2002).

The court in *Lewis* analyzes the procedural history of *Brunner*, pointing out that the three-pronged test was developed by the district court in *Brunner v. New York State Higher Educ. Servs. Corp. (In re Brunner)*, 46 B.R. 752 (S.D.N.Y. 1985), and eventually affirmed by the Second Circuit. The district court linked the test to the purpose behind section 523(a)(8), "to forestall students, who frequently have a large excess of liabilities over assets solely because of their student loans, from abusing the bankruptcy system to shed these loans." *Id.* at 755. Reversing the bankruptcy court's decision to discharge Brunner's student loans on the basis of undue hardship, the district court held

that Brunner failed to establish a good faith attempt to pay the loans because:

(1) she filed for bankruptcy relief within one month of the date the first loan

payment came due; (2) she made no attempt to repay the loans; and (3) she did

not request a deferment. *Id.* at 758. The Second Circuit affirmed for the same

reasons. 831 F.2d 395, 397 (2d Cir. 1987).

But by the time the circuit court issued its opinion, almost five years had

passed since the debtor's bankruptcy filing. The circuit, at the end of its

opinion, suggested that the debtor might reopen the issue of the

dischargeability of her student loans based on her current circumstances. *Id.*

at 397.

The court in *Lewis* concludes that,

> This suggestion is a clear statement of the importance of the passage
> of time to the dischargeability of student loans . . . . Thus, while time
> alone is no longer a basis for discharge of a student loan, it remains
> an important factor in this determination. The presumptive
> nondischargeability of student loans was never meant to be a
> permanent millstone around the debtor's neck.

276 B.R. at 920.

In this case, the loans were first due when Amy graduated in 2012. They

entered default in 2018. Defendant now requests a judgment that the entire

amount of the loans is immediately due in full. Defendant noted at trial that

they may attempt to work out a repayment plan with the Plaintiffs, but they

would not be legally bound to it.

The Court will not saddle the Plaintiffs with a $59,720 nondischargeable

debt on the suggestion of Defendant that the parties might come to a

resolution—particularly one, as BND posits, that would last for 25 years but

24

still not pay the debt. The facts establish that Amy did contact Defendant,

qualified for forbearance or deferment, and did not have the ability to repay the

loans. She acted in good faith.

**CONCLUSION**

Requiring Amy and Dennis to pay back Amy's student loan obligations to

Bank of North Dakota would pose an undue hardship under section 523(a)(8).

The Eliasons have struggled to maintain a minimal standard of living since

Amy graduated from Globe University. Both Amy and Dennis lack the ability to

significantly increase their earning potential for the foreseeable future. And

while Amy obtained deferments and forbearances during the repayment period

of the loans, she and Dennis ultimately submitted to the pressure of their other

financial obligations and filed bankruptcy. This Court will not deprive them of a

fresh start by saddling them with nondischargeable student loans.

The loans are discharged. Defendant's counterclaim is dismissed.

This decision shall constitute findings of fact and conclusions of law

pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil

Procedure.

A separate order and judgment consistent with this decision will be

entered.

Dated:  August 8, 2023

BY THE COURT:

_____

Hon. Catherine J. Furay
U.S. Bankruptcy Judge